## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**
    **Plaintiff,**

*vs*.           **CRIMINAL ACTION NO. 1:10CR74**

**BENJAMIN BRYAN,**
     **Defendant.**

### REPORT AND RECOMMENDATION/OPINION

On the 12th day of October 2010, the Defendant, Benjamin Bryan, through counsel, J. Michael Benninger, filed a Motion to Suppress Evidence [Docket Entry 11]. On November 5, 2010, the United States Attorney, through his Assistant United States Attorney, Shawn A. Morgan, filed a "Response in Opposition to Defendant Motion to Suppress" [Docket Entry 18]. On November 17, 2010, Defendant filed his Offer of Proof in Support Motion to Suppress [Docket Entry 23]. The matter was referred to the undersigned United States Magistrate Judge by United States District Judge Irene M. Keeley by Order dated October 13, 2010 [Docket Entry 12].

On November 18, 2010, came the Defendant, Benjamin Bryan, in person, and by his counsel, J. Michael Benninger, and also came the United States by its Assistant United States Attorney, Shawn A. Morgan, for hearing on Defendant's Motion to Suppress Evidence [Docket Entry 11].

### Procedural History

Defendant Benjamin Bryan was indicted by a grand jury attending the United States District Court for the Northern District of West Virginia on September 9, 2010. The one-count indictment charges the defendant with "Receiving/Possessing an Unregistered National Firearms Act Weapon." [Docket Entry 1]. A summons was issued, and Defendant was arraigned and pled "not guilty" on September 28, 2010 [Docket Entry 7].

**Statement of Undisputed Facts**

1)      Defendant Benjamin Bryan's parents, Robert W. Bryan and Caitlyn P. Bryan, are the owners of 1280 Hillside Drive, Fairmont, Marion County, West Virginia.

2)      On September 24, 2009, Kimberly Bryan leased 1280 Hillside Drive to four tenants for a 10-month term.  Defendant signed the lease as the landlord.  The lease provides:

> In the event in breech of the payment of rent or any other allowed charge, or other breech of the payment of rent or any other allowed charge, or other breech of this Lease, Landlord shall have full rights to terminate this Lease in accordance with state law and re-enter and re-claim possession of the leased premises, in addition to such other remedies available to Landlord arising from said breech.

Under "Additional Lease Terms" is a handwritten provision:

> Due to the fact that the four tenants are college students, tenants agree to not have parties with more than ten persons (10) in the house or outside the house at any time. If the house is damaged or misused in a manner not considered to be "normal" use of a home the tennants will vacate the premises with (7) days from date of incident without legal proceedings being required.  (Seven days).

3)      Defendant Benjamin Bryan and Cara Bryan are the owners of 1284 Hillside Drive, Fairmont, West Virginia.

4)      On January 20, 2010, Marion County 911 received a telephone call regarding a "LANDLORD TENNANT [sic] DISPUTE."  According to the CAD record, 4 units responded, one of which was reportedly Officer Glen Staley, who, according to the CAD, advised "all parties adv. and separated."

5)      That same date, Robert Bryan, Defendant's father,  filed a petition for summary relief in Marion County Magistrate Court, for "Wrongful Occupation of Residential Rental Property" at 1280 Hillside Drive.  The petition alleged one of the tenants refused to pay her share of the January rent; Fabiola Siewe had moved into the home without signing the lease; and the front door glass was broken, along with other damage.  The petitioner requested past due rent payment in the amount of

$250.00; as well as:

> All damages including front door glass repaired. Actual cost will have to be assessed after they move and we do a walk through inspection – approx $200 00 at this time – but may increase after inspection. <u>I want them out of premise by February 1, 2010 and I also want paid $450.00 plus court costs</u>.

(Emphasis in original).

6)      A civil summons was issued to each tenant by the Magistrate Court, setting February 1, 2010, for a hearing on the petition.

7)      Marion County Magistrate Cathy Reed-Vanata conducted a hearing on the petition on February 1, 2010. The record of the hearing shows Magistrate Reed-Vanata found in favor of Robert Bryan for $250.00 plus $100.00 in court costs against tenant Tatiana Bonner, and dismissed the case against tenant Gerod Gill, finding he had paid his rent.

8)      Also on February 1, 2010, Kimberly Bryan and Defendant Benjamin Bryan leased 1280 Hillside Drive to a James Damon Waters.

9)      On February 2, 2010, Defendant Benjamin Bryan entered 1280 Hillside Drive, Fairmont, and removed a television and laptop computer.

10)     That same date a call was placed to Marion County 911 by Tracy Samuels, who reported "Landlord will not give them their car back." According to the CAD report Fairmont Police Officer Brian Speakman responded and reported it was a disagreement over a phone, and "a civil matter over ve[hicle?] . . ."

9)      That same date a call was placed to Marion County 911 by Trisha Samuels, reporting that she had been gone from 1280 Hillside Drive for about an hour. When she got home she found that the door had a chair against it, the couch was overturned, and the big screen tv was missing.

10)     That same date, Fairmont Police Officer Glenn Staley obtained a search warrant for

1284 Hillside.  The affidavit and complaint for search warrant provides as follows:

> This day personally appeared before the undersigned, a magistrate for said County, CPL G STALEY, who, after being first duly sworn, upon his oath says:
>
> That on the 2 day of FEB, 2010, and prior to the making of this Complaint, in the said county of MARION, BEN BRIAN did unlawfully *(and feloniously) STEAL FROM 1280 HILLSIDE DRIVE A PLASMA TV OWNED BY GERALD GILL AND A DELL LAPTOP OWNED BY FAVIOLA SIEWE DURING A RESIDENTIAL BURGLARY AND THEN CONCEAL AT 1284 HILLSIDE DRIVE, FAIRMONT WV
> and that the affiant has cause to believe and does believe that property,
> > *a)(Stolen)(Embezzled)(Obtained by false pretenses)
> > *b)(Designed and intended for use) (which is and has been used) as a means of committing such criminal offense
> > *c)(Manufactured)(sold)(kept)(concealed)(possessed)(controlled)(designed and intended for use)(which is and has been used) in violation of the criminals laws of the state
> > *d)(Evidence of a crime)
>
> Namely, 42 INCH SAMSUNG PLASMA TV AND DELL INSPIRON LAPTOP COMPUTER WITH A SHIN IT STICKER ON THE COVER is concealed in 1284 HILLSIDE DRIVE, FAIRMONT WV CREAM COLOR WITH BROWN BASEMENT WITH STEPS LEADING FROM THE ROAD TO THE FRONT DOOR and that the facts for such belief are ON 2-2-2010 THE RESIDENCE AT 1280 HILLSIDE DRIVE WAS ENTERED BY A [sic] UNLOCKED REAR WINDOW, AND TAKEN FROM THE HOUSE WAS A 42 INCH SAMSUNG TV AND A DELL LAPTOP.  THERE WAS [sic] TRACKS FROM THE BACK DOOR OF THE RESIDENCE WHICH WENT THROUGH THE SNOW (APPEAR TO BE FRESH) TO 1284 HILLSIDE DRIVE TO THE BACK DOOR.

*Strike out inapplicable words.

11)     On February 2, 2010, Marion County Magistrate Melissa Linger signed the Search

Warrant after *b) and *c) were struck out.

12)     Fairmont Police Officers executed the search warrant that same date.  They gained

entry to  1284 Hillside Drive by kicking in a door.

13)     No consent was given to search 1284 Hillside Drive.

14)     ATF Special Agent Kenneth Grace was telephoned by Officer Stalely during the

4

search of the residence. Officer Staley told Special Agent Grace that during the execution of the search warrant, a "sawed-off shotgun" was discovered in Defendant's bedroom.

15) Special Agent Grace had no role in and took no part in seeking or obtaining the State search warrant utilized by the Fairmont Police Department to enter into the residence at 1284 Hillside Drive.

16) Special Agent Grace traveled to 1284 Hillside Drive and met with a Fairmont Police Officer, who showed him the "sawed-off shotgun" in Defendant Bryan's bedroom. The firearm was hanging on the headboard bedpost and was identified as a Westernfield shotgun.

17) Special Agent Grace seized the firearm and ammunition and removed it from Defendant's residence. He left a property receipt to evidence his seizure of the firearm.

18) On February 3, 2010, Special Agent Grace caused a records query of the ATF National Firearms Registration and Transfer Record and determined the subject firearm had not been previously registered as required by the National Firearms Act.

19) The firearm in question was determined to be a sawed-off shotgun.

### Contentions of the Parties

Defendant contends:

1) Probable cause did not support the issuance of the search warrant.

2) If probable cause is found to support the issuance of the search warrant, probable cause was defeated by material omissions in the affidavit pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

3) The execution of the search warrant was overly broad.

4) The gun was not in plain view.

5)     The officers were not where they should have been when the gun was found.

6)     Nothing was readily apparent about the gun that would have made it obvious contraband.

The Government contends:

1)     Probable cause existed for the issuance of the search warrant.

2)     Defendant fails to make the substantial showing necessary for a <u>Franks</u> hearing.

3)     The execution of the search warrant was not overly broad. The law does not require the ATF agent to obtain a federal search warrant under Rule 41, before entering a residence to take possession of contraband found during a valid search.

4)     The gun was in plain view, hanging by a rope sling from the bedpost in the master bedroom.

5)     The gun, found in plain view, was a sawed-off shotgun, which is contraband.

## Testimony and Evidence Received at Hearing

At the hearing held November 18, 2010, the Court heard the testimony of Fairmont Police Officer Glen Staley, Fairmont Police Officer Brian Speakman, and ATF Special Agent Kenneth Grace, and admitted into evidence Government Exhibit 1 and Defense Exhibits 1 and 2.

## Discussion

## Probable Cause Supporting Search Warrant

The Court first heard Defendant's argument that probable cause did not support the search warrant. "The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." <u>United States v. Wilhelm</u>, 80 F.3d 116 (4th Cir. 1996). "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." <u>Payton v. New York</u>, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) quoting <u>United States v. United States District Court</u>, 407 U.S. 297, 313, 92

S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961).

The Fourth Amendment to the Constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." There is probable cause to search a home if there is a fair probability that evidence of a crime is located within the residence. See United States v. Murphy, 241 F.3d 447, 457 (6th Cir. 2001). Whether probable cause exists must be determined "under the totality of the circumstances." See Illinois v. Gates, 462 U.S. 213 (1983).

In a review of an issued search warrant, "great deference" is given to the issuing judicial officer's probable cause determination. United States v. Blackwood, 913 F.2d139, 142 (4th Cir. 1990). The test on review is whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant. Massachusetts v. Upton, 466 U.S. 727, 728 (1984). To that end, the reviewing court does not conduct a de novo review but instead limits itself to the information presented to the magistrate who issued the warrant. Id. See also United States v. Wilhelm, 80 F. 3d. 116, 118 (4th Cir. 1996).

The determination of whether the State magistrate had probable cause to issue the warrant to search is made by answering the question: From a totality of the circumstances presented to the issuing judge, was there "a fair probability that contraband or evidence of a crime" would be found in the residence and attached building? Illinois v. Gates, 462 U.S. 213, 238 (1983).

Defendant argues the search warrant was defective in that the affidavit of Officer Staley supplied an insufficient basis for a finding of probable cause. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 231, 103 S. Ct. 2317 (1983). According to the Fourth Circuit, it is not necessary that the officials "possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause." Taylor v. Farmer, 13 F.3d 117, 121-122 (4th Cir. 1993).

In this case the information presented to the State magistrate included a conclusion or belief by officer Staley that the defendant burglarized 1280 Hillside Drive and stole a plasma tv owned by Gerald Gill and a Dell laptop owned by Fabiola Siewe and then concealed the items at 1284 Hillside Drive. The facts presented in support of Officer Staley's belief was that on February 2, 2010, the 1280 Hillside Drive residence was entered by an unlocked rear window, and taken from the house was a 42 inch Samsung tv and a Dell Laptop. "There was [sic] tracks from the back door of the residence which went through the snow (appear to be fresh) to 1284 Hillside Drive to the back door."

Besides arguing that the affidavit "was wholesale deficient in any fact" to support probable cause, Defendant additionally argues that the information that was presented to the magistrate could just have easily led to some other cause besides a theft by Defendant.

The Government argues that the affidavit was sufficient to provide probable cause, and also

that an affidavit does not have to include other possible reasons for the evidence.

As noted, this Court must give "great deference" to the issuing judicial officer's probable cause determination. United States v. Blackwood, 913 F.2d139, 142 (4th Cir. 1990). From a totality of the circumstances presented to the issuing magistrate (1. entry of 1280 Hillside through unlocked rear window; 2) taking of television and laptop from 1280 Hillside; 3) apparent fresh tracks in snow from back door of 1280 to back door of 1284 Hillside), there was "a fair probability that contraband or evidence of a crime" would be found in 1284 Hillside Drive. Illinois v. Gates, 462 U.S. 213, 238 (1983). The undersigned therefore finds substantial evidence in the record supporting the magistrate's decision to issue the warrant. Massachusetts v. Upton, 466 U.S. 727, 728 (1984).

## Entitlement to Franks Hearing

Defendant next argues that Officer Staley "knowingly and intentionally filed a false affidavit and improperly and unlawfully obtained the State Search Warrant alleging Defendant Bryan had committed a burglary," because Officer Staley "fully knew and was advised of Defendant's status as a landlord for 1280 Hillside Drive . . . his presence in the rental property and his removal of the television and laptop computer and the real and ongoing dispute between the owners of, landlord for and the tenants of 1280 Hillside Drive." The undersigned finds, and the parties both agree, that the falsehoods alleged by Defendant are not affirmative false statements, but, at best are alleged "material omissions."

To be entitled to a Franks hearing, a defendant must make a "dual showing . . . which incorporates both a subjective and an objective threshold component." United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990). First, Defendant "must make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included

by the affiant in the warrant affidavit." <u>Franks</u>, 438 U.S. at 155-156 (quotations omitted). Secondly, the offending information must be essential to the probable cause determination; if the offending information is excluded and probable cause still remains, no <u>Franks</u> hearing is required. <u>Id.</u> Accord <u>United States v. Friedmann</u>, 210 F.3d 227, 229 (4th Cir.)(purpose of <u>Franks</u> hearing is "to prevent the admission of evidence obtained pursuant to warrants that were issued only because the issuing magistrate was misled into believing that there existed probable cause"), <u>cert</u>. <u>denied</u>, 531 U.S. 875 (2000).

A <u>Franks</u> hearing is not required where neither statements in the affidavit, <u>nor alleged omissions</u>, "operated to defeat the sufficiency of the probable cause showing otherwise made or . . . so seriously undermined [the affiant's] credibility as to render [the probable cause showing] unreliable"), <u>cert.</u> <u>denied</u>, 122 S. Ct. 1295 (2002); <u>United States v. Akinoye</u>, 185 F.3d 192, 199 (4th Cir. 199)(<u>Franks</u> hearing not required where probable cause existed apart from alleged inconsistencies in affidavit.) <u>cert</u> <u>denied</u>, 528 U.S. 1177 (2000); <u>United States v. Gray</u>, 47 F.3d 1359, 1364-65 (4th Cir. 1995) (<u>Franks</u> hearing not required absent "substantial preliminary showing" that affiant made knowing and intentional false statements); <u>United States v. Jeffus</u>, 22 F.3d 554, 558 (4th Cir. 1994)(noting Defendant's heavy burden in establishing need for <u>Franks</u> hearing); and <u>United States v. Chavez</u>, 902 F.2d 259, 265 (4th Cir. 1990) (Defendant must show that agent affirmatively tried to mislead magistrate to warrant <u>Franks</u> hearing; ambiguity or lack of clarity is insufficient).

The Fourth Circuit first applied <u>Franks</u> to intentional, material omissions in <u>U.S. v. Colkley</u>, 899 F.2d at 301-302 (4th Cir. 1990). To successfully attack an affidavit based on omitted information, the defendant must show: (1) that the omission is the product of a deliberate falsehood or of a reckless disregard for the truth, and (2) inclusion of the omitted information in the affidavit

would defeat probable cause.  Id.  See also Photogrammetric Data Services, 259 F.3d 229 (4th Cir. 2001).  However, as the Court noted in Colkley, all known exculpatory information need not be included in an affidavit, and omission of information is less likely to require a Franks hearing than is the knowing inclusion of false information. "[T]he fact of an omission, standing alone, is not sufficient to demonstrate intent of reckless disregard." See Colkley, supra.

Defendant argues that Officer Staley deliberately or with a reckless disregard for the truth omitted from his affidavit information including that both officers Staley and Speakman  had been to the scene on prior occasions; knew of disputes between the owner/landlord and tenants; knew of the proximity of the two houses; knew of the ownership of the two houses; knew the tenants had broken a window; knew that Defendant lived next door and acted as landlord; knew Defendant's father had sought the tenant's eviction and even advised him to go to magistrate court to seek the eviction.  They also omitted that Defendant and his family thought the tenants had already moved out, as evidenced by their already having leased the house to a new tenant on February 1, 2010.  They also omitted that they knew the tenants were "bad kids" who had been drinking despite being underage.  Absent from Defendant's proof or offer of proof is any deliberateness, recklessness or other motive on the part of the officers in omitting the information.

Regarding the materiality of the omitted information, Defendant argues that had the omitted information been included in the affidavit, the magistrate would have found it "equally plausible" that the tracks in the snow were evidence of fair and reasonable conduct.  The omitted information would have "clearly" explained the tracks.  Defendant zealously argued there was "no way in the world" that a magistrate looking at the totality of the information including the omitted information would have found probable cause to issue the search warrant.

The Government argues that Defendant failed to meet his burden under <u>Colkley</u> that the omitted information was relevant or that its inclusion would have defeated probable cause. The fact that there was an ongoing dispute does not defeat probable cause. The tenants reported that their residence was burglarized and items were missing. There were fresh tracks in the snow leading from their residence to Defendant's residence. Nothing that was omitted would defeat the probable cause found by the state magistrate on the fact included in the affidavit before her.       The undersigned concedes that it is possible that the magistrate, if provided with all the facts, <u>may</u> have made a different decision. This Court, however, cannot speculate on what may have occurred. Instead, this Court is bound by <u>Colkley</u>. The undersigned does not find that Defendant has met his burden of showing that the omissions were the product of deliberate falsehood or of a reckless disregard for the truth. Further, Defendant has not met his burden of showing that the information, if it had been included, would defeat probable cause. In fact, had the omitted information been included it would not have defeated probable cause that contraband would be found in 1284 Hillside Drive, based on the entry of 1280 through an unlocked window; the taking of the television and laptop computer; and the fresh tracks in the snow from the back door of 1280 to 1284. As the Court held in <u>Colkley</u>, all known exculpatory information need not be included in an affidavit, and omission of information is less likely to require a <u>Franks</u> hearing than is the knowing inclusion of false information.

Counsel for Defendant stated passionately on the record that he objected to the prior case law, including <u>Colkley</u>, and the higher burden where there was an alleged omission of information as opposed to an affirmative falsehood. In order to preserve his objection for appeal, counsel placed on the record of the hearing his belief that the current United States Supreme Court would not uphold the higher burden for an omission of information.

Upon consideration of all of the above, the undersigned finds Defendant has not met his burden and that, therefore a Franks hearing is not required.

## Scope of Search

Defendant next argues that the scope of the search as executed was overbroad. The United States argues that the gun at issue was found in plain view while the officers were searching for the allegedly stolen items. In determining the proper scope of a search the language in a warrant "is not to be assessed in a hypertechnical manner. United States v. Srivastava, 540 F.3d 277 (4th Cir. 2008). Rather, the scope of a search warrant should be interpreted "in a commonsense and realistic fashion." Id. A search is not deemed overbroad merely because it results in criminal charges in addition to those initially contemplated. Andersen v. Maryland, 427 U.S. 463 (1976).

## Plain View Doctrine

"[T]he plain view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." United States v. Jackson, 131 F.3d 1105 (4th Cir. 1997); United States v. Williams, 41 F.3d 192 (4th Cir. 1994). See, in particular, United States v. Wells, 98 F.3d 808 (4th Cir. 1996)(upholding seizure of firearm during execution of search warrant in bank fraud investigation, based on supervising agent's knowledge that subject was a convicted felon), and United States v. Legg, 18 F.3d 240 (4th Cir. 1994) (applying "good faith exception" and plain view doctrine to uphold seizure of firearm with obliterated serial number).

Assuming an officer is lawfully in a particular place, the plain view doctrine permits "a minor detour" to get a better look at the evidence. Jackson, supra, at 1110( officer's return to basement of

house to look at suspicious items first observed during consent search for fugitive was "minor detour . . . [not] an unreasonable intrusion").

In determining whether the incriminating character of the seized item is "readily apparent," it is sufficient if "the agents collectively ha[ve] probable cause to believe the "item was evidence of a crime at the time of the seizure." Wells, supra at 810 (rejecting Defendant's argument that the incriminating character of the item must be readily apparent to the individual agent who actually seizes it.)

The undersigned heard the testimony of Officer Staley, who testified that when he went to 1284 Hillside Drive, he went to search for a flat screen television and laptop computer. He testified that he first conducted a search of the house to "clear" it– make sure no one was in the house. During the initial sweep, he saw a pot pipe and baggie containing marijuana in the kitchen and a pair of boots which may have matched the tracks in the snow, by the front door. He next went into the bathroom where he saw nothing in plain view. He next went to Defendant's bedroom, where the "first thing" he noticed was a shotgun hanging on the left back bedpost. He then cleared the other bedroom where he spotted a television in the open closet.

Officer Staley testified that after his initial sweep he went back to the kitchen and secured the pot. He next returned to the bathroom. He had still not found the laptop. In Defendant's bedroom he looked at the shotgun again, and determined it appeared to be cut down. He was not certain of the proper length to be considered illegal, but it appeared to him that the length of the barrel of the shotgun was too close to the pump action. It appeared cut off and clearly shorter than his 18" police shotgun. He contacted ATF Special Agent Grace because he had just had a firearms class conducted by him and had his contact information.

Officer Staley was shown Government Exhibit 1, which was a photograph showing the gun in plain view hanging from the bedpost. He testified that the photograph accurately depicted the position of the gun when he first saw it. He also testified that he believed he ran the serial number of the gun before Special Agent Grace arrived, but was not sure. Once SA Grace arrived, he turned the gun over to him. Special Agent Grace told him the gun was too short, and was illegal. He also testified that he called Special Agent Grace because in his 32 years as an officer, he had only dealt with a sawed-off shotgun on one other occasion.

Upon cross examination, Officer Staley testified that although the search warrant specified only the television and laptop, it also included "evidence of a crime." He saw the length of the shotgun appeared to be too short, which was in itself evidence of a crime.

Officer Staley also testified on cross examination that although he had talked to Defendant on the phone and someone else had come looking for Defendant, that meant only that Defendant may not have been home. He could "never assume" that there was no one else in the house before he searched. He testified he reported the shotgun at 10:23 pm. He did not seek another search warrant for the shotgun, and SA Grace had no part in getting the original search warrant. When asked why he called SA Grace, he testified that the ATF Agent was more knowledgeable about firearms. He also testified that the Mutual Aid Compact with the Federal Government gave him the ability to contact anyone he wanted to contact. SA Grace came and took possession of the shotgun. He believed SA Grace left a property receipt.

When asked why the CAD report said the allegedly stolen items were recovered at 10:23 pm and SA Grace became involved afterward, Officer Staley testified only that he observed the firearm during the protective sweep of the residence, before he saw the television, and before he found the

laptop.

The undersigned also heard the testimony of Officer Bryan Speakman, who testified he assisted Officer Staley with the search, but that his role was mostly that of waiting for the arrival of the defendant and of SA Grace. He was not involved in the actual search. When asked what items he believed were found first, he testified he thought somebody talked about a tv or a gun. He believed the electronic items were found first, but he was not really certain. He remembered Officer Staley stating "he could see a shotgun" but where or when that was said was not clear.

## Rule 41

Defendant argues that the entry into the house by ATF Special Agent Grace and his seizure of the firearm violated Federal Rule of Criminal Procedure 41(b)(1) which provides, in pertinent part:

> At the request of a federal law enforcement officer or an attorney for the government:
> (1) a magistrate judge with authority in the district – or if none is reasonably available, a judge of a state court of record in the district – has authority to issue a warrant to search for and seize a person or property located within the district.

The undersigned heard the testimony of ATF Special Agent Kenneth Grace, who testified he did not remember exactly when he was contacted by the local officers, but believed he was told: "We're at a house executing a search warrant," and that the officers believed they had a sawed-off shotgun and requested his help. He did know it was dark and he was already in bed when he was called. The search warrant had already been executed when he arrived.

SA Grace testified he did not examine the search warrant before entering the house. He did not recall whether he reviewed the search warrant before he seized the gun. The gun appeared short upon first examination. He measured it at the scene. It was 15 ½" long. He seized the gun himself.

He also prepared the property receipt for the gun and left it at the residence before he left. The gun was loaded when he first saw it. It had shells in the magazine.

The government advised that it had supplemental support for the Federal Agent's following behind the State officers, in the form of US v. Reyes, 283 F.3d 446 (2nd Cir. 2002). In Reyes, federal probation officers were found to have properly searched the defendant's residence pursuant to his conditions of release, despite the fact that they were following up on a tip from the DEA. DEA agents were at the site, but did not enter the residence until the defendant consented to their search. The defendant later moved to suppress evidence found by the DEA, arguing that the probation officers had acted unlawfully as a "stalking horse" for the DEA. The court noted, however, that a probation officer does not act as a stalking horse if he initiates the search in the performance of his duties as a probation officer, as long as he was not initiating the search in order to help police evade the Fourth Amendment's warrant and probable cause requirements.

Defendant submitted supplemental authority in the form of United States v. Sanchez, 509 F.2d 886 (6th Cir. 1975). In Sanchez, a Toledo, Ohio police officer received a call from a confidential informant advising that he had seen heroin in the defendant's residence. The officer drafted a narcotics search warrant for the residence and obtained a warrant issued by a local judge. Before executing the warrant, the officer received a second call from the same confidential informant advising that there were also explosives at the defendant's residence. The officer contacted an ATF agent, advised him of the explosives, and requested his assistance in the search. The court noted the federal ATF agent was an expert in the handling of explosives and apparently entered the premises for the specific purpose of searching for and seizing them. Id. at fn1.

Significantly, two hours elapsed between the time the federal agent was notified and the time

the warrant was executed; yet no additional warrant for the explosives was sought by either the local or federal officers. Several local officers, along with the ATF agent, executed the search warrant at the defendant's residence. The search failed to uncover any narcotics. However, the ATF agent found a box and a footlocker containing a total of 70 pounds of explosives (the box was marked with a distinctive red symbol denoting that it contained explosive material). The agent immediately determined the explosives had been recently stolen and they were seized. A federal indictment was returned approximately 30 days later.

The Sixth Circuit noted that the only warrant issued was the one directing the Toledo police to search for narcotics. The simultaneous search by the federal agent for explosives was admittedly warrantless. The Government argued, however, that the warrantless intrusion was justified by the state officers' request for assistance and that the seizure was permissible under the plain view exception. The court found the explosives were in plain view. The court also found, however, that the warrant authorized only the local officers to enter and search the property for narcotics, and could not validate the entry of the federal officer where he had both probable cause and the opportunity to obtain a separate warrant to search for different types of property. The court found, "[o]n the facts of this case," that there were two simultaneous but distinct intrusions, each conducted by separate agencies for the purpose of securing different types of property. Each search had to be authorized independently by a separate warrant unless excused by a valid exception. The court found significant that the ATF agent already had probable cause to suspect explosives were in the residence, and also had the opportunity to secure a warrant, but instead simply entered the premises with local officers who were conducting a search for unrelated property. The court held that such action violated the constitution.

*Sanchez* is distinguishable from the case at bar in one significant respect. As the Sixth

Circuit held:

> When a law enforcement officer has prior knowledge of the existence and location
> of property which he has probable cause to believe is illegally possessed, as well as
> ample opportunity to obtain a judicially sanctioned search warrant, the Fourth
> Amendment mandates that he must follow this procedure . . . . If he fails in this duty,
> he may not proceed on the authority of another unrelated warrant to justify his
> intrusion. Because the ATF agent had no right to be on the Sanchez premises during
> the raid, he did not satisfy the threshold requirement of the plain view doctrine and
> thus his warrantless seizure of the explosives was unconstitutional.

Id. at 890. The court distinguished another decision in which state officers turned over a gun to a

federal agent after they had conducted a search, stating:

> We do not regard Carwell as controlling since the opinion does not focus on the
> crucial issue presented by this case – whether the federal agent had a right to be on
> the premises in order to justify his warrantless seizure of property under the plain
> view exception. Unlike the present case Carwell did not involve a simultaneous
> search for different articles by local and federal authorities.

(Emphasis added). Even the Sixth Circuit itself distinguished *Sanchez* from cases similar to the one

currently before this Court. See, e.g., U.S. v. Bonds, 12 F.3d 540 (1993).

The undersigned also notes the case U.S. v. Coronna, 420 F.2d 1091 (5th Cir. 1970), in which

city police officers obtained a search warrant to search for marijuana. Upon execution of the search

warrant, the city police officers discovered not only marijuana but counterfeit money, and

immediately notified Federal officers. The counterfeit money was turned over to the Federal officers

when they arrived at the defendant's apartment. The defendant argued, as does Defendant in this

case, that the search was conducted in violation of then-Rule 41(a) of the Federal Rules of Criminal

Procedure, which provided:

> (a) Authority to Issue Warrant. A search warrant authorized by this rule may be
> issued by a judge of the United States or of a state, commonwealth or territorial court

19

of record or by a United States commissioner within the district wherein the property sought is located.

The government, in <u>Coronna</u>, agreed that the court issuing the search warrant was not a court of record, but argued there was no federal search. Likewise, the undersigned finds there was no federal search in the present case. The warrant was obtained to search for the items allegedly stolen from the tenants. While searching for those items, the officers observed the shotgun in plain view. There is absolutely no evidence that any federal officer took part in obtaining the warrant or in the search itself. The gun was found by the State officers. The gun could legally have been seized by the State officers as evidence of a crime against West Virginia law, which also prohibits sawed-off shotguns.

In <u>U.S. v. Smith</u>, 914 F.2d 565 (4th Cir. 1990), the defendant argued that evidence seized during a search should have been suppressed because the search was federal in nature but the warrant was issued by a county magistrate. He was indicted by a federal grand jury on drug charges. He argued that the search was federal in nature because a DEA agent was present during the search and after the search the matter became largely a federal prosecution. The Fourth Circuit noted that a state police officer spearheaded the search. Affirming the conviction, the Fourth Circuit found:

> Lieutenant Dotson, a state police officer, spearheaded the search. Significantly, there is no evidence that he applied for the warrant at the direction or urging of a federal officer. *See, e.g., United States v. MacConnell*, 868 F.2d 281, 284 (8th Cir. 1989)(significant prior involvement by federal officials required before a search may be categorized federal); *United States v. Bookout*, 810 F.2d 965, 967 (10th Cir. 1987)(search is federal "when federal officers are directly involved in carrying out the search itself and in taking immediate custody of the fruits of the search"); *United States v Bedford*, 519 F.2d 650, 654 n.1 (3d Cir. 1975)("something more than 'mere participation' by federal officers must be found before a state search is transformed into a federal undertaking") *cert. denied*, 424 U.S. 917, 96 S.Ct.1120, 47 L.Ed.2d 323 (1976). Although a DEA agent was present during the search and requested the motel manager to phone Smith and lure him from his room, this in itself is

insufficient to render the search a federal one.  *Cf.  United States v. Johnson*, 451 F.2d 1321, 1322 (4ᵗʰ Cir. 1971)(mere presence of three federal agents during search insufficient to implicate requirements of Rule 41(a)), *cert. denied*, 405 U.S. 1018, 92 S.Ct. 1298, 31 L.Ed.2d 480 (1972).

See also U.S. v. Claridy, 601 F.3d 276 (4th Cir. 2010), in which the defendant argued that a federal law enforcement officer violated Rule 41 by applying to a state judge for a warrant, despite the fact that he was conducting a federal narcotics investigation and despite the fact that there was no indication that a federal magistrate was unavailable.  The case involved a joint federal-state law-enforcement task force investigating violations of both federal and state law.

The Fourth Circuit first recognized that its prior decisions held that, at most, Rule 41 required that a federal law enforcement officer, or someone at his direction or urging, apply for a warrant covered by the Rule.    The Fourth Circuit then found that the triggering condition for application of Rule 41 is not a finding that the investigation was federal in nature but a determination that the proceeding was a federal proceeding.  Nothing in the Federal Rules of Criminal Procedure suggests that a joint task force cannot use either federal or state investigatory tools governed, respectively, by federal or state law.  The Fourth Circuit noted:

> Restricting warrants issued under state law to the requirements of Rule 41 in every joint investigation would 'place officers acting jointly on the horns of a dilemma in deciding whether to charge state or federal crimes.  Such officials should be free to make a considered choice based on the best available information and unencumbered by merely technical procedural rule.
>
> . . . .
>
> Thus, the question of what law governs the application for a warrant cannot be resolved solely on the basis of the investigation's character, but instead turns on the nature of the judicial proceeding undertaken during the course of the investigation, such as a proceeding initiated by the application for a search warrant.  Therefore, when a member of a joint task force initiates a proceeding in state court to obtain a search warrant in furtherance of the joint investigation, it is not only relevant to

understand the role of federal officers in obtaining the warrant and conducting the search, but it is also necessary to review the details of the proceeding itself to determine what law the warrant will serve and the scope of the warrant. Search warrants obtained during a joint federal-state investigation may be authorized by Federal Rule 41(b) or by state law and may serve to uncover violations of federal law as well as state law . . . .

The application for a search warrant in <u>Claridy</u> was made to a state judge, presenting probable cause to believe that Claridy was violating state narcotics laws. The state judge issued the warrant, directing any police officer of Baltimore City or Baltimore County to search for evidence of violations of state narcotics law and to seize relevant evidence. The Fourth Circuit found:

Because the warrant alleged violations of state law, the state judge's authority to issue the warrant and supervise its return was conferred by Maryland law - - and the authority of Detective Gladstone to execute the warrant came from his position as a "police Officer of Baltimore City."
. . . .
In this case, we readily conclude that the application for the search warrant initiated a state proceeding governed by state law and that it was not a federal proceeding governed by Rule 41(b). . . . . . Because we conclude that the legal authorization for the search warrant in this case was Maryland law, not Rule 41(b), we reject Claridy's argument that the evidence should be suppressed because its issuance did not comply with the requirements of Rule 41(b).

Significantly, in the case at bar, the investigation was <u>not</u> a joint federal-state investigation, but solely a state investigation. In fact, it is highly unlikely if not impossible that a federal officer could have obtained a warrant from a federal judge to search for evidence of the burglary. The search was clearly a state proceeding and therefore not subject to Rule 41(b).

Even if the Court were to find the seizure of the gun was a federal proceeding, the Fourth Circuit has held that there are two categories of Rule 41 violations: those involving constitutional violations, and all others. <u>See</u> <u>U.S. v. Simons</u>, 206 F.3d 392 (4th Cir. 2000), in which the Court held:

Non-constitutional violations of Rule 41 warrant suppression only when the defendant is prejudiced by the violation . . . . or when "there is evidence of

intentional and deliberate disregard of a provision in the Rule . . . ."

The case at bar does not involve a constitutional violation. As found in <u>Claridy</u>:

> Alternatively, if we were to assume, for purposes of discussion that Rule 41(b) was applicable – presumably based on the facts deemed important by Claridy that the task force included federal officers and was federally funded and that the prosecution was ultimately under federal law – we would still reject his argument because the purported violations of Rule 41(b) were nonconstitutional and nonprejudicial . . . Nor is there any evidence that the purported violations were an intentional and deliberate effort to disregard or circumvent Rule 41 . . . .Thus, even the violation claimed by Claridy would not justify suppression of the evidence seized under the warrant.

Again, significantly, the search warrant in the present case was sought by a local police officer from a state magistrate, to search for and seize evidence of a burglary. There is no evidence that the officers were intentionally and deliberately disregarding or circumventing Rule 41, as there is no evidence they were even aware there may be an illegal firearm or any other evidence of a federal crime in the residence. As already noted, the crime being investigated was solely a state crime. Further, Defendant has not shown any prejudice, because the sawed-off shotgun was also evidence of a state crime and could have been seized and prosecuted as such.

The undersigned finds the evidence shows the city police officers were lawfully in the room where they observed the sawed-off shotgun in plain view. The undersigned also finds that there was at least probable cause for the officer's belief that the gun was evidence of a crime at the time of the observance, making its incriminating nature "readily apparent" under <u>U.S. v. Wells</u>, 98 F.3d 808 (4th Cir. 1996). Finally, the undersigned finds there was no violation of Rule 41 because there is no evidence any federal officers had any part in the investigation that led to the search warrant. Special Agent Grace was called in only after the officers observed the gun in plain view. There is no

evidence that the police acted in an intentional and deliberate effort to disregard or circumvent Rule 41, and the violation, if there was one, was nonconstitutional and nonprejudicial.

## **RECOMMENDATION**

For the reasons herein stated, it is **RECOMMENDED** that Defendant's Motion to Suppress [Docket Entry 11] be **DENIED**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 2nd day of December 2010.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE